UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DON RUBIN,

        Plaintiff,

  v.

APPLE, INC., *et al.*,

        Defendants.
_____/

No. C-09-2607 PJH (EMC)

**REPORT AND RECOMMENDATION RE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

**(Docket No. 57)**

        Plaintiff Don Rubin has filed suit against Defendants Apple, Inc., Quetouch.com, and Cancerian-9 for copyright infringement. Apple has made an appearance in the case[1] but not Quetouch.com or Cancerian-9. Currently pending before the Court is Mr. Rubin's motion for default judgment against Quetouch.com and Cancerian-9, which the assigned judge has referred to the undersigned for a report and recommendation.[2] Having considered the briefs filed and accompanying submissions, as well as all other evidence of record, the Court hereby recommends that the motion for default judgment be **GRANTED**.

///

///

---

[1] Mr. Rubin and Apple settled their dispute in May 2010. *See* Docket No. 70 (certification of ADR session); Docket No. 75 (stipulated dismissal).

[2] Mr. Rubin's motion for default judgment was originally filed on March 31, 2010. This report and recommendation has not issued until now because the Court had been waiting for information from Mr. Rubin critical to the issue of personal jurisdiction, as discussed below. That information was provided on August 23, 2010. *See* Docket No. 76 (Migchelbrink Decl.).

## I.  FACTUAL & PROCEDURAL BACKGROUND

In his first amended complaint ("FAC"), Mr. Rubin alleges as follows. Mr. Rubin is a United States citizen from Newton, Massachusetts, currently working and living in Bangkok, Thailand. *See* FAC ¶ 6. Apple is a California corporation with its principal place of business in Cupertino, California. *See id.* ¶ 7. Quetouch.com and Cancerian-9 are both Thailand-based companies. *See id.* ¶¶ 8-9.

Mr. Rubin is the author of an original puzzle as well as five derivative puzzles. *See id.* ¶¶ 10-11. Mr. Rubin obtained a copyright for the puzzles in 1977. *See id.* ¶ 13. Quetouch.com and Cancerian-9 developed an iPhone application called "Parking Lot," which copies Mr. Rubin's copyrighted puzzles in all material respects. *See id.* ¶¶ 2-3, 8-9. On and after January 1, 2008, Apple, Quetouch.com, and Cancerian-9 began selling the infringing iPhone application. *See id.* ¶¶ 2, 16.

Apple made an appearance in the case soon after being served. Judge Hamilton allowed Mr. Rubin to serve the summons and complaint on Quetouch.com and Cancerian-9 by alternative means – more specifically, by e-mail and Federal Express. *See* Docket No. 51 (order). Counsel for Mr. Rubin represents that the contact person for Quetouch.com and Cancerian-9, Panutat Tejasen,[3] acknowledged receipt of the summons and complaint via e-mail. *See* Docket No. 54 (Cohen Decl. ¶ 4); Docket No. 55 (Cohen Decl. ¶ 4). However, neither Quetouch.com nor Cancerian-9 thereafter made an appearance in the case. Accordingly, Mr. Rubin asked that default be entered against the two companies, and their default was entered by the Clerk of the Court on March 24, 2010. *See* Docket No. 56 (notice). The currently pending motion for default judgment was thereafter filed.

In support of the motion, counsel for Mr. Rubin submitted a declaration stating that, based on documents obtained from Apple, it appears that the profits Quetouch.com and Cancerian-9 obtained from the sale of their infringing iPhone Application amounted to $224,758.85. This included purchases made by persons and/or entities residing outside the United States. *See* Docket No. 57 (Cohen Decl. ¶ 7 & Ex. A). Mr. Rubin argues that such profits should be awarded to him based on

---

[3] The same person appears to be the contact person for both Quetouch.com and Cancerian-9.

the copyright infringement by Quetouch.com and Cancerian-9, as well as costs in the amount of $454.79.  Mr. Rubin waives at this time an award of attorney's fees.  *See* Mot. at 8.

## II.     DISCUSSION

A.     Service of Process

In deciding whether to grant or deny a default judgment, a court must first "assess the adequacy of the service of process on the party against whom default is requested."  *Board of Trustees of the N. Cal. Sheet Metal Workers v. Peters*, No. C-00-0395 VRW, 2000 U.S. Dist. LEXIS 19065, at *2 (N.D. Cal. Jan. 2, 2001).  In the instant case, Quetouch.com and Cancerian-9 appear to be Thailand-based companies.  *See* Compl. ¶¶ 8-9.  Under Federal Rule of Civil Procedure 4(h), "a domestic or foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name" may be served "at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery."  Fed. R. Civ. P. 4(h)(2).  Under Rule 4(f), service may be effected by, *inter alia*, any "means not prohibited by international agreement, as the court orders."  Fed. R. Civ. P. 4(f)(3).

In the instant case, the assigned judge authorized service, pursuant to Rule 4(f), by means of e-mail and Federal Express.  *See* Docket No. 51 (order).  (There is nothing in that order or anywhere else in the record to indicate that service by such means was prohibited by international agreement.)  Judge Hamilton specified that e-mail service had to be accomplished such that "delivery of such emails is either confirmed ('delivery receipt') or the emails are not returned as 'mailbox unavailable' or 'undeliverable.'"  *Id.* (Order at 2).  Mr. Rubin has provided proofs of service indicating that service of the summons and complaint by e-mail and Federal Express was accomplished.  *See* Docket Nos. 52-53 (proofs of service).  While there is no evidence indicating that the e-mails were either confirmed or not returned as undelivered, for purposes of this report and recommendation, the Court assumes that, at the very least, the latter is true.  Assuming such, the Court concludes that service of process was properly effected in compliance with Judge Hamilton's order of February 17, 2010, *see* Docket No. 51 (order), and therefore turns to the merits of the motion for default judgment.

B. <u>Merits of Motion for Default Judgment</u>

After entry of a default, a court may grant a default judgment on the merits of the case. *See* Fed. R. Civ. P. 55. "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Factors that a court may consider in exercising that discretion include:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Generally, upon entry of default, the factual allegations of the plaintiff's complaint will be taken as true, except for those relating to the amount of damages. *See TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987). *But see* Fed. R. Civ. P. 55(b)(2) (providing that a court may conduct hearings when, to enter or effectuate judgment, it needs to, *e.g.*, establish the truth of any allegation by evidence or investigate any other matter).

C. <u>Personal Jurisdiction</u>

In the instant case, the Court – before reaching the *Eitel* analysis described above – must address a predicate issue, that is, whether there is personal jurisdiction over Quetouch.com and Cancerian-9. The Ninth Circuit has instructed that, "when a court is considering whether to enter a default judgment, it may dismiss an action sua sponte for lack of personal jurisdiction." *Tuli v. Republic of Iraq (In re Tuli)*, 172 F.3d 707, 712 (9th Cir.1999); *see also Dennis Garberg & Assocs. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 772 (10th Cir.1997) (noting that "a district court must determine whether it has jurisdiction over the defendant before entering judgment by default against a party who has not appeared in the case").

> When [as in the instant case] no federal statute governs personal jurisdiction, the district court applies the law of the forum state. California's long-arm status is co-extensive with federal standards, so a federal court may exercise personal jurisdiction if doing so comports with federal constitutional due process. "For a court to exercise personal jurisdiction over a nonresident defendant, the defendant must have at least 'minimum contacts' with the relevant

4

> forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"

*Boschetto v. Hansing*, 539 F.3d 1011, 1015-16 (9th Cir. 2008). While there are two forms of personal jurisdiction that a forum state may exercise – general jurisdiction and specific jurisdiction – Mr. Rubin makes no assertion in the instant case that there is general jurisdiction over the Thailand-based companies. Accordingly, the Court focuses solely on the issue of specific jurisdiction.

The Ninth Circuit has

> established a three-prong test for analyzing a claim of specific personal jurisdiction:
>
> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.
>
> The plaintiff bears the burden of satisfying the first two prongs of the test. If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state. If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

In the instant case, the critical prong is the first. "The first prong is satisfied by either purposeful availment or purposeful direction . . . . 'A purposeful availment analysis is most often used in suits sounding in contract. A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort.'" *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010).

The instant case, as noted above, concerns copyright infringement. Because copyright infringement is, in essence, a tort, that would suggest that a purposeful direction analysis should be used. And in fact, in a recent opinion, the Ninth Circuit applied a purposeful direction analysis in a

5

copyright infringement case. *See id.* However, the Ninth Circuit has also made clear that, even in a tort case, a purposeful availment, rather than a purposeful direction, analysis may be used where appropriate. Most notably, in *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir. 1997), the Ninth Circuit applied a purposeful availment analysis in a case involving trademark infringement. *See id.* at 419-20. Because this is a report and recommendation, the Court conducts both a purposeful direction and a purposeful availment analysis.

### 1. Purposeful Direction

Under Ninth Circuit law,

> a court evaluates purposeful direction using the three-part "*Calder*-effects" test, taken from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). Under this test, "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." There is no requirement that the defendant have any physical contacts with the forum.

*Brayton Purcell*, 2010 U.S. App. LEXIS 10928, at *7.

#### a. Intentional Act

In the case at bar, the first *Calder* element – *i.e.*, that the defendant must have committed an intentional act – is easily satisfied. The Ninth Circuit "'construe[s] "intent" . . . as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act.'" *Id.* at *8-9. Here, the allegations in the complaint, taken as true, indicate that Quetouch.com and Cancerian-9 committed an intentional act by developing an allegedly infringing iPhone application and working with Apple to make the application available for distribution. *See id.* at *9 (concluding that defendant "committed an intentional act when it created and posted an elder law section on its website that infringed [plaintiff's] copyright").

#### b. Foreseeable Harm

Because resolution of the pending motion ultimately turns on the second *Calder* element, the Court reserves discussion of that element for last and addresses next the third *Calder* element – *i.e.*, the requirement that the defendant must have caused harm that the defendant knows is likely to be suffered in the forum state. This is another way of saying that the harm must have been foreseeable in the forum state. With respect to foreseeability of harm, Mr. Rubin makes three arguments.

1    First, Mr. Rubin argues that there was foreseeable harm in California because the Thailand-based companies had an agreement with Apple that any litigation among them would take place in California. *See* Docket No. 73 (Pl.'s 2d Supp. Br. at 6). This argument is without merit. That Apple, Quetouch.com, and Cancerian-9 agreed that venue for any litigation among them would take place in California does not necessarily mean that Quetouch.com and Cancerian.9 would know that harm from infringement of Mr. Rubin's copyright would likely occur in California. That fact may inform whether the exercise of jurisdiction would comport with fair play and substantial justice but is not enough to establish foreseeability of harm in California.

Second, Mr. Rubin asserts that there was foreseeable harm in California because he votes in California, has a California driver's license, and has maintained a residence in California "almost continually for twenty years." Docket No. 73 (Rubin Decl. ¶ 2). It is true that the residence of the plaintiff in the forum state may, in some circumstances, define the situs of the harm. *See*, *e.g.*, *Bancroft & Masters, Inc. v. Augusta National, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (indicating that *Calder* effects test satisfied where "the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state"); *Panavision Int'l, L.P. v. Toeppen*, 146 F.3d 1316, 1321 (9th Cir. 1998) (stating that the defendant knew that the plaintiff "would likely suffer harm [in the forum state of California] because, although at all relevant times Panavision was a Delaware limited partnership, its principal place of business was in California, and the heart of the theatrical motion picture and television industry is located there"). But, in the instant case, the Court gives Mr. Rubin's alleged residence in California little weight because the declaration submitted by Mr. Rubin is not consistent with either his original or first amended complaint, in which he indicated that he was a resident of Thailand or at best Massachusetts, but not California. *See* Docket No. 1 (Compl. ¶ 6) (alleging that Mr. Rubin is a United States citizen from Massachusetts "currently working and living in Bangkok, Thailand"); Docket No. 38 (FAC ¶ 6) (same). The Court notes that, even when it first asked for supplemental briefing from Mr. Rubin on the issue of personal jurisdiction, he submitted supplemental papers (without any supporting evidence) simply stating that he "*sometimes* resides" in California. Docket Not. 66 (Pl.'s Supp. Br. at 4) (emphasis added). Only after the Court asked for supplemental

7

1  briefing on personal jurisdiction a second time did Mr. Rubin provide the above-described
2  declaration.[4]  The Court thus concludes that Mr. Rubin has failed to establish residency in California
3  sufficient to establish harm therein.
4      Finally, Mr. Rubin argues that it was foreseeable that harm would be suffered in California
5  because that is "where Apple has its headquarters."  Docket No. 73 (Pl.'s 2d Supp. Br. at 6).
6  Unfortunately, Mr. Rubin has not clearly explained what significance that fact has.  This suit has
7  been brought by Mr. Rubin, not Apple.
8      While, for the reasons stated above, the Court does not find persuasive any of the arguments
9  tendered by Mr. Rubin, it ultimately concludes that there is sufficient evidence in the record to
10 establish foreseeability of harm in the case at bar.  In a tort case such as this, harm may be suffered
11 in places other than where the plaintiff resides.  For example, in *Panavision*, the plaintiff sued the
12 defendant for trademark violations.  The Ninth Circuit held that the defendant knew that the plaintiff
13 would likely suffer harm in California, the forum state, not only because the plaintiff's principal
14 place of business was located in California but also because "the heart of the theatrical motion
15 picture and television industry is located there."  *Panavision*, 141 F.3d at 1322.  In addition, in *Dole
16 Food Co. v. Watts*, 303 F.3d 1104 (9th Cir. 2002), the Ninth Circuit expressly noted that "[o]ur
17 precedents recognize that in appropriate circumstances a corporation can suffer economic harm both
18 where the bad acts occurred and where the corporation has its principal place of business."  *Id.* at
19 1113.  More to the point, in *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir.
20 1994), a patent infringement case, the Federal Circuit held that, under a state long-arm statute that
21 allowed for personal jurisdiction over a person who caused a tortious injury in the state, the
22 plaintiff's injury occurred at the place of the infringing sale rather than the place where the plaintiff

---

[4] The Court notes, however, that, if Mr. Rubin did in fact reside in California, it would not necessarily require that Quetouch.com and/or Cancerian-9 have *knowledge* of his residence in order for there to be specific jurisdiction over the companies. *Cf. Facebook, Inc. v. ConnectU*, No. C 07-01389 RS, 2007 U.S. Dist. LEXIS 61962, at *14-15 (N.D. Cal. Aug. 13, 2007) (noting that "the technology of the Internet can, in at least some cases, provide a means whereby specific, targeted, conduct may be 'expressly aimed' at a particular individual or entity, despite the fact that the person engaging in the conduct may not know the *geographic* location of the individual or entity") (emphasis in original).

resided. The court noted that "economic loss occurs to the patent holder at the place where the infringing sale is made because the patent owner loses business there." *Id.* at 1571.

The above cases establish that the situs of the "harm" for purposes of the *Calder* test may be informed not necessarily where the plaintiff resides but also by the nature of the underlying claim. For instance, where the harm is to the plaintiff's reputation resulting from defamation, the forum or community in which the plaintiff resides may define the situs of the reputation injury. *See, e.g.*, *Calder*, 465 U.S. at 783. Where the claim is for competitive harm to a business resulting from a copyright infringement, the market in which the plaintiff operates may define the situs of the harm. *See, e.g.*, *Brayton Purcell*, 606 F.3d at 1124. *Dole Food* and *Beverly Hills Fan* are in accord.

In the instant case, the critical act which gives rise to damages is the sale of the infringing application. Similar to the situation in *Beverly Hills Fan*, Mr. Rubin's injury occurred at the place of the infringing sale. *See Beverly Hills Fan*, 21 F.3d at 1571. Given the nature of the market for the accused application here and their material distribution via Apple, Defendants knew of the likelihood of sales to (and thus harm inflicted in) California. Thus, the foreseeabilty element is satisfied here.

        c.     <u>Express Aiming</u>

Under the second *Calder* element, the defendant's conduct must be expressly aimed at the forum state. In the instant case, Mr. Rubin argues that this factor has been satisfied because (1) the allegedly infringing iPhone application was offered for sale on Apple's iTunes store and (2) because sales have in fact been made through the iTunes store and "[i]t is fair to assume that some of those sales were to Californians." Docket No. 66 (Pl.'s Supp. Br. at 3). Subsequently, Mr. Rubin provided concrete evidence that a significant amount of sales have been made to Californians. *See* Docket No. 76 (Migchelbrink Decl. ¶ 3) ("Apple paid royalty payments in excess of $25,000 to an individual 'Panutat Tejasen' for sales of ParkingLot where the purchaser of ParkingLot used a credit card with a California ZIP code.").

While these factors help establish harm (resulting from sales) was foreseeably inflicted in California, they do not satisfy the express aiming element. These are two separate and distinct inquiries. *Cf. Schwarzenegger*, 374 F.3d at 807 (although harm may have occurred to

Schwarzenegger in California, defendants' acts were aimed at Ohio, where sales took place, not California).

In applying the express aiming element of *Calder*, the Ninth Circuit has made clear that foreseeable harm in the forum state is not enough – there has to be conduct aimed at the forum; the forum or residents thereof must somehow be targeted. *See id.* at 802; *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1157 (9th Cir. 2006); *see also Boschetto v. Hansing*, 539 F.3d 1011, 1023-24 (9th Cir. 2008) (Rymer, J., concurring). Here, neither the allegations of the complaint nor the evidence offered in support of the motion for default judgment establishes that Quetouch.com and/or Cancerian-9 targeted California residents for sale of the accused application. There is no evidence, for instance, of advertising reaching California residents. The fact that Apple is headquartered in California and the application was sold through Apple's iTunes store does not, without more, establish that California consumers were targeted since Apple sales are nationwide. *Cf. id.* at 1022-23 (Rymer, J., concurring) (noting lack of evidence that defendant tailored his eBay auction to California residents or sent or advertised auction to California; adding that defendant "[a]rguably . . . could foresee that California residents would bid on his auction, and that he would benefit from their participation, but foreseeable participation by Californians is not enough" – individual targeting was needed); *Sayeedi v. Wasler*, 835 N.Y.S.2d 840, 846 (2007) (noting that "[n]o evidence was provided by plaintiff as to defendant's overall eBay statistics, experience, or of any marketing directed at potential customers, designed for instance, to welcome bids from New Yorkers or any other acts that indicate defendant may be purposely availing himself specifically to the business of New Yorkers or any desire to take advantage of New York law[;] [t]he defendant was prepared to sell his Chevrolet engine to whoever the highest bidder happened to be regardless of the state in which they happened to reside"); *see also Winfield Collection, Ltd. v. McCauley*, 105 F. Supp. 2d 746, 749 (E.D. Mich. 2000) (agreeing that defendant did not purposefully avail herself of the privilege of doing business in Michigan were she did not target Michigan specifically but simply made offers for sale on eBay; noting that "the function of an auction is to permit the highest bidder to purchase the property offered for sale, and the choice of that highest bidder is therefore beyond the control of the seller"). *But see Inset Systems, Inc. v. Instruction Set, Inc.*, 937 F. Supp. 161 (D. Conn. 1996), cited in

1  *Cybersell*, 130 F.3d at 418 (noting that, in *Inset Systems*, advertising via Internet and toll-free
2  number was directed "toward the State of Connecticut (and all states)").
3       That the sales of the accused application was made through a website owned and controlled
4  by a third party, Apple, and not Quetouch.com or Cancerian-9, further attenuates the likelihood that
5  the Thailand-based companies targeted California residents.  The Court notes that the main authority
6  on which Mr. Rubin relies, *Stomp, Inc. v. Neato, LLC*, 61 F. Supp. 2d 1074 (C.D. Cal. 1999), is
7  distinguishable precisely because it involved a website owned and/or controlled by the defendant
8  rather than a third party.  *See Boschetto*, 539 F.3d at 1019 n.5 (distinguishing *Stomp* because, *inter
9  alia*, the defendant used its own website as a portal for on-line sales rather than another's).
10      2.     Purposeful Availment
11      Although the Court concludes that Mr. Rubin has not satisfied the express aiming element of
12 the *Calder* effects test based on the record presented, that does not end the inquiry.  The *Calder* test
13 is only one method of establishing specific personal jurisdiction.  As noted by the Ninth Circuit in
14 *Schwarzenegger*, the first prong of the test for specific personal jurisdiction requires that the
15 defendant *either* "purposefully direct his activities [or consummate some transaction with the forum
16 or resident thereof; *or* perform some act by which he purposefully avails himself of the privilege of
17 conducting activities in the forum."  *Schwarzenegger*, 374 F.3d at 802 (emphasis added).  While the
18 *Calder* effects test (including its express aiming element) generally applies to tort actions and the
19 purposeful availment test generally applies to contract actions, there is no hard and fast line
20 sequestering the two or making them mutually exclusively.  Significantly, *Cybersell* involved a
21 claim of trademark infringement which is more analogous to a tort claim than a contract claim; yet
22 the Ninth Circuit still employed a purposeful availment analysis.  *See Cybersell*, 130 F.3d at 418-20.
23 Moreover, the court – after finding no purposeful availment – went on to examine as an alternative
24 basis for jurisdiction the *Calder* effects test.  *Id.* at 420.  Thus, in any particular case, *either*
25 purposeful direction or purposeful availment may suffice to establish personal jurisdiction.
26      Even though a copyright infringement claim is analogous to a tort action and is thus typically
27 amenable to analysis under the *Calder* effects test, *see, e.g.*, *Brayton Purcell*, 606 F.3d at 1128, the
28 instant case is equally, if not more, amenable to the purposeful availment analysis that was applied

in *Cybersell*. Where the nature of the wrongful conduct is not intended to harm a particular party through, *e.g.*, defamation (*e.g.*, *Calder*) or unfair competition (*e.g.*, *Brayton Purcell*), but is more diffused and aimed at the market more generally (*e.g.*, *Cybersell, Inc.*), the purposeful availment analysis may be more apt.

In this regard, the Court finds the Ninth Circuit's decision in *Boschetto* particularly instructive. *Boschetto,* a purposeful availment (contract) case, involved a defendant's use of a third party's website (eBay instead of Apple) to sell a product. In *Boschetto*, the plaintiff, a California resident, purchased a car from the defendant through eBay. The Ninth Circuit concluded that the California district court lacked personal jurisdiction over the defendant because the dealings between the plaintiff and the defendant essentially constituted a one-shot affair. *See Boschetto*, 539 F.3d at 1017.

Notably, the court rejected the plaintiff's argument that it was significant that the transaction was consummated via eBay – *i.e.*, that the eBay listing could have been viewed by anyone in California with Internet access. *See id.* at 1017-18. It explained:

> [T]he issue is not whether the court has personal jurisdiction over the intermediary *eBay* but whether it has personal jurisdiction over *an individual who conducted business over eBay.* . . . Here, the eBay listing was not part of broader e-commerce activity; the listing temporarily advertised a good for sale and that listing closed once the item was sold, thereby extinguishing the Internet contact for this transaction within the forum state (and every other forum).

*Id.* at 1018 (emphasis added; internal quotation marks omitted). The Ninth Circuit added that "the cases that have found that jurisdiction was proper based on eBay sales relied heavily on the fact that the defendant was using the platform as a broader vehicle for commercial activity." *Id.* at 1019. It concluded:

> Where eBay is used as a means for establishing regular business with a remote forum such that a finding of personal jurisdiction comports with "traditional notions of fair play and substantial justice," then a defendant's use of eBay may be properly taken into account for purposes of establishing personal jurisdiction.

*Id.*

That appears to be the case here. Defendants, though their contract with Apple to carry and sell the infringing application through the iTunes store, employed Apple not to make a one-time sale

12

but to serve as a "platform as a broader vehicle for commercial activity." *See id.* (citing cases where defendants used intermediary websites for commercial and regular and systemic sales). Moreover, unlike passive websites (*e.g.*, *Cybersell*), Apple's iTunes store through which the accused application was sold is an interactive website. *See Cybersell*, 130 F.3d at 418 (citing, *inter alia*, *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (purposeful availment based on interactive website)).

However, in assessing whether purposeful availment test is met, the Court must assess the "'nature and quality of commercial activity that an entity conducts over the Internet.'" *Cybersell*, 130 F.3d at 419. The Court may consider, *e.g.*, the volume of Internet activity from residents in the forum state and other evidence that "Internet activity was directed at, or bore fruit in, the forum states." *Id.*; *see also Trintec Indus. v. Pedre Promotional Prods.*, 395 F.3d 1275, 1281 (Fed. Cir. 2005) (noting that the defendant's "websites contain some interactive features aimed at transacting business, [but] it is unclear how frequently those features are utilized or, indeed, whether any District residents have ever actually used [the] website to transact business"); *Allstar Mktg. Group, LLC v. Your Store Online*, LLC, 666 F. Supp. 2d 1109, 1122 (C.D. Cal. 2009) ("conclud[ing] that by operating a highly commercial website through which regular sales of allegedly infringing products are made to customers in this state, the [defendants] have purposefully availed themselves of the benefits of doing business in this district, such that they should reasonably anticipate being haled into court here"); *Salu, Inc. v. Original Skin Store*, No. CIV. S-08-1035 FCD/KJM, 2008 U.S. Dist. LEXIS 73225, at *13-14 (E.D. Cal. Aug. 13, 2008) (indicating that personal jurisdiction is appropriate when an entity actually conducts some business via the Internet with forum residents); *Starlight Int'l, LTD. v. Lifeguard Health, LLC*, C 08-1894 RS, 2008 U.S. Dist. LEXIS 58927, at *16 (N.D. Cal. July 22, 2008) (concluding that the defendant had purposefully availed itself of the benefits of California because over the course of a year it made more than $2,500 in sales to California consumers through its interactive website – sales "sufficient to provide [the defendant] with a reasonable expectation that it may be haled into a California court to respond to disputes arising out of those transactions").

In the case at bar, Mr. Rubin initially presented evidence of substantial worldwide sales of the accused application – indeed, he even presented evidence of substantial sales to residents of the United States generally. *See* Docket No. 57 (Cohen Decl., Ex. A) (indicating that, in 2008 and 2009, $180,037.20 in sales were made to the United States). However, he provided no evidence about sales to California residents, with the sole exception of a litigation-inspired sale made to his counsel. After inquiry by this Court, Mr. Rubin finally provided evidence of a significant amount of sales of the allegedly infringing iPhone application to California residents specifically – more than $25,000 in sales. *See* Docket No. 76 (Migchelbrink Decl. ¶ 3) (stating that "Apple paid royalty payments in excess of $25,000.00 to an individual 'Panutat Tejasen' for sales of ParkingLot where the purchaser of ParkingLot used a credit card with a California ZIP code."). Given this amount in sales, the Court concludes that Quetouch.com and Cancerian-9 had a reasonable expectation that they might be haled into a California court to respond to a dispute arising out of those sales. See *Starlight Int'l*, 2008 U.S. Dist. LEXIS 58927, at *16 (concluding that the defendant had purposefully availed itself of the benefits of California because over the course of a year it made more than $2,500 in sales to California consumers through its interactive website – sales "sufficient to provide [the defendant] with a reasonable expectation that it may be haled into a California court to respond to disputes arising out of those transactions").

    3.    Fair Play and Substantial Justice

As Mr. Rubin has provided evidence regarding sales made to California through an interactive website as part of a broad commercial platform – thus satisfying the purposeful availment prong of the specific personal jurisdiction test – there is little doubt that his claim of copyright infringement "arises out of or relates to the defendant's forum-related activities," *i.e.*, sales of the infringing application. *Schwarzenegger*, 374 F.3d at 802.

The Court thus addresses the third prong of the specific jurisdiction test – whether "the exercise of jurisdiction . . . comport[s] with fair play and substantial justice, *i.e.*, it must be reasonable." *Id.* This prong has particular significance in a case such as the one at bar where jurisdiction is predicated on Defendants' nationwide marketing efforts through, *e.g.*, interactive websites and not activities specifically targeting a particular forum or resident(s) thereof. In this

instance, a finding of purposeful availment could be made as to many, if not all, states, thus potentially subjecting Defendants to personal jurisdiction in any state in the nation. The test of fair play and substantial justice assures that the overarching mandate of due process affords reasonable protection to such a defendant.

In particular, the inquiry under this third prong requires the Court to determine whether the exercise of jurisdiction in this forum is, as an ultimate matter, fair and reasonable. As a preliminary matter, the Court notes that it is Defendants' burden to make a compelling case that the exercise of jurisdiction would not be reasonable. Since Defendants have not made an appearance, that standard has not been met. Moreover, the Court notes that there are several factors in the instant case which make such exercise reasonable. As noted above, Mr. Rubin has provided evidence that there are substantial sales of the accused application to California residents, a fact that counsels in favor of jurisdiction. In addition, the fact that Defendants contracted with Apple, which is based in this forum, to sell their application and stipulated to a venue clause in this forum demonstrates they could have reasonably expected to be haled into this Court in connection with its efforts to market and sell the subject application.

D.   *Eitel* Analysis

Having concluded that there is an adequate showing of personal jurisdiction based on the purposeful availment test, the Court now turns to the *Eitel* inquiry. The majority of the *Eitel* factors weigh in favor of a default judgment.

For example, if the motion for default judgment were to be denied, then Mr. Rubin would likely be left without a remedy. *See Walters v. Shaw/Guehnemann Corp.*, No. C 03-04058 WHA, 2004 U.S. Dist. LEXIS 11992, at *7 (N.D. Cal. Apr. 15, 2004) ("To deny plaintiffs' motion [for default judgment] would leave them without a remedy. Prejudice is also likely in light of the merits of their claim."); *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery."). In addition, because Defendants have not filed an answer to the complaint, there is little to suggest that there is a possibility of a dispute concerning material facts. Furthermore, it is unlikely that Defendants' default was due to excusable neglect, especially when the contact person

for Quetouch.com and Cancerian-9, Panutat Tejasen, acknowledged receipt of the summons and complaint via e-mail, *see* Docket No. 54 (Cohen Decl. ¶ 4); Docket No. 55 (Cohen Decl. ¶ 4), and Mr. Rubin thereafter served the motion for default judgment on Defendants but still received no response. Finally, Mr. Rubin has adequately stated a claim for copyright infringement in his complaint, s*ee Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1037 (9th Cir. 2000) ("A claim for copyright infringement has two elements: '(1) ownership of the copyright; and (2) infringement -- that the defendant copied protected elements of the plaintiff's work'"), and the sum of money at stake in the action is not completely inappropriate given that it is, for the most part, tailored to the specific misconduct of Defendants, *i.e.*, infringing sales. *See Pepsico*, 238 F. Supp. 2d at 1176 (stating that "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct").

Because the *Eitel* factors largely weigh in favor of a default judgment, the Court therefore recommends that Mr. Rubin's motion for default judgment be granted.

E.   Damages

Having determined that default judgment is appropriate, the Court now turns to the question of damages. The Court reiterates that, although, as a general matter, the factual allegations of the plaintiff's complaint will be taken as true upon entry of default, this rule does not apply to allegations relating to the amount of damages. *See TeleVideo*, 826 F.2d at 917. The plaintiff has the burden of proving up damages. *See Board of Trustees of Pipe Trades Dist. Council No. 36 v. Drexal Power, Inc.*, No. C 04-0630 BZ, 2004 U.S. Dist. LEXIS 15657, at *5-6 (N.D. Cal. July 26, 2004). In the instant case, Mr. Rubin seeks the profits made by Defendants from the sale of the infringing iPhone application, plus his litigation costs.

1.   Costs

Mr. Rubin asks that he be awarded his litigation costs in the amount of $454.79. *See* Docket No. 57 (Cohen Decl. ¶ 10). These costs represent the cost of the filing fee and service-of-process fees. The costs are reasonable and should be awarded pursuant to 28 U.S.C. § 1920 and Civil Local Rule 54-3.

### 2. Defendants' Profits

In addition to costs, Mr. Rubin seeks an award representing the profits that Quetouch.com and Cancerian-9 obtained from the sale of their infringing iPhone Application. According to Mr. Rubin, these profits amounted to $224,758.85. However, this included purchases made by persons and/or entities residing outside the United States. *See* Docket No. 57 (Cohen Decl., Ex. A). It appears that, out of the $224,758.85, $44,721.65 came from purchasers who lived outside the United States. The remaining $180,037.20 came from purchasers who lived within the United States.

Because it was not clear to the Court that Mr. Rubin was entitled to the profits related to purchases made by non-U.S. residents, it asked him to provide supplemental briefing on the issue. Mr. Rubin did so. *See* Docket No. 73 (2d Supp. Br. at 6-7). According to Mr. Rubin, overseas profits should be included because Defendants authorized, from within the United States, the sale of the infringing iPhone application implicitly without any geographic limitation. Mr. Rubin adds that the authorization was made in the United States because Defendants' agreement with Apple was executed in California.

The Court is not persuaded by Mr. Rubin's argument. First, Mr. Rubin has provided no evidence that the agreement between Defendants and Apple was in fact executed in the United States. Furthermore, while an inference arguably could be made that Apple signed the agreement in the United States because it is a company based in the United States, it is at least questionable whether Defendants signed the agreement in the United States as both are Thailand-based companies. Similarly, given that both companies are based in Thailand, it is plausible that Defendants' authorization for Apple to distribute the infringing iPhone application was given from Thailand, and not the United States.

Second, the authority cited by Mr. Rubin – in particular, *Peter Starr Production Co. v. Twin Continental Films, Inc.*, 783 F.2d 1440 (9th Cir. 1986), is problematic. Notably, in *Subafilms, Ltd. v. MGM-Pathe Comms. Co.*, 24 F.3d 1088 (9th Cir. 1994), the Ninth Circuit overruled "*Peter Starr* insofar as it held that allegations of an authorization within the United States of infringing acts that take place *entirely abroad* state a claim for infringement under the [Copyright] Act." *Id.* at 190 (emphasis added).

17

That being said, there is once again a saving grace for Mr. Rubin.  If Apple engaged in direct infringement within the United States and the authorization to do so was given by Defendants abroad (*i.e.*, extraterritorially), then Defendants' authorization would constitute contributory infringement for which it could be held liable under United States copyright law.  *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) (stating that "a defendant is a contributory infringer if it (1) has knowledge of a third party's infringing activity, and (2) 'induces, causes, or materially contributes to the infringing conduct'"); 3-12 Nimmer on Copyright § 12.04[D][2] (in discussing secondary liability, stating that "the direct infringement must occur within the United States [*i.e.*, it cannot be extraterritorial]" but that "the subject authorization may be (although it obviously need not be) extraterritorial").

In examining whether there has been direct infringement by Apple in the United States, the Court looks to 17 U.S.C. § 106 which identifies the exclusive rights held by a copyright owner. Section 106(3) provides that a copyright owner has the exclusive right "to distribute copies . . . of the copyrighted work to the public by sale."  17 U.S.C. § 106(3).  In 2008, Congress amended the Copyright Act and clarified that exportation from the United States is part of a copyright owner's exclusive right to distribute.  *See* Nimmer § 8.11[B][2] (discussing amendment).  More specifically, the Act provides that "exportation from the United States, without the authority of the owner of the copyright under this title, of copies . . . , the *making of which* . . . constituted an infringement of copyright . . . is an infringement of the exclusive right to distribute copies . . . under section 106." 17 U.S.C. § 602(a)(2) (emphasis added).  This is consistent with case law allowing for "[r]ecovery of damages arising from overseas infringing uses [where] the *predicate* act of infringement occurring within the United States enabled further reproduction abroad."  *L.A. News Serv. v. Reuters Tv Int'l*, 149 F.3d 987, 992(9th Cir. 1998) (emphasis added); *see also Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988) (stating that, "[i]f the illegal reproduction of the poster occurred in the United States and then was exported to Israel, the magistrate properly could include damages accruing from the Israeli newspapers").  *See, e.g.*, *Music Sales Ltd. v. Charles Dumont & Son, Inc.*, No. 09-1443, 2009 U.S. Dist. LEXIS 97534, at *20 (D.N.J. Oct. 19, 2009) (noting that there was no violation of the exportation right because "there is no allegation that the infringing

copies were *made* in violation of copyright; Plaintiffs allege only that the distribution of the (otherwise lawful) copies infringes upon their license") (emphasis in original).

The Nimmer treatise provides an example of how a copyright owner's exportation right under the Act may be violated.

> Let us imagine that film prints are struck in Hollywood. *D* owns all rights to that motion picture in the United States, *E* owns all rights to it in Brazil, and *F* owns all Japanese rights. . . .
>
> Now let us posit that *F* strikes prints at the facility [in Hollywood] . . . for the sole purpose of bringing them to the Kyoto film festival, where *F* has every right to exploit them. To the extent that the conduct unfolds without *D*'s authorization, it infringes both *D*'s reproduction right and the exportation prong of *D*'s distribution right. To that extent, the 2008 amendment to the statute simply magnifies theories of liability, and is *pro tanto* unnecessary. To give independent content to the exportation right, we must further refine the scenario: Prints for the film were manufactured in Afghanistan, at which point none of *D*'s rights were violated. Subsequently, *F* transshipped those copies through the United States for delivery to Japan. Under those circumstances, only the distribution right will have been violated.

Nimmer § 8.11[[B][2].

There is sufficient evidence establishing direct infringement by Apple in the instant case. Apple engaged in a predicate act of infringement; by selling the infringing applications through the iTunes store, which presumably required copying the applications (*e.g.*, onto its servers), Apple copied Mr. Rubin's copyrighted work without authorization. The subsequent act of exporting those infringing copies from the United States for international sales therefore violates Mr. Rubin's protected distribution/exportation right. The facts of the instant case are, in essence, analogous to the second Nimmer example above. Because Defendants contributed to Apple's direct infringing by providing the infringing application, they may be held liable for contributory infringement, and the Copyright Act allows for the award of "any profits of the infringer that are attributable to the infringement," 17 U.S.C. § 504(b), including those resulting from exportation.

Accordingly, the Court recommends that Mr. Rubin's request for a damages award of $224,758.85 – which includes the purchases made by persons or entities residing outside the United States – be granted.

### III. RECOMMENDATION

For the foregoing reasons, the Court recommends that Mr. Rubin's motion for default judgment be granted and that damages be awarded as follows: $224,758.85 representing Defendants' profits and $454.79 representing Mr. Rubin's costs.

Mr. Rubin shall serve a copy of this report and recommendation on Defendants within three days of the date of this order. Service shall be effected, as previously authorized by Judge Hamilton, by e-mail and Federal Express

Any party may file objections to this report and recommendation with the district judge within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); Civil L.R. 72-3.

Dated:  September 7, 2010

_____
EDWARD M. CHEN
United States Magistrate Judge